UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No. 23-01541-VB

| | |
|---|---|
| In re:<br><br>PURDUE PHARMA L.P., *et al.*,<br><br>　　　　　Debtors. | Case No. 19-23649 (SHL)<br><br>Adv. Pro. No. 19-08289 (SHL) |
| LAC LA RONGE INDIAN BAND (CANADIAN FIRST NATION)<br><br>　　　　　Appellant,<br>　　v.<br><br>PURDUE PHARMA L.P., *et al.*,<br><br>　　　　　Appellees. | On Appeal from the United States Bankruptcy Court for the Southern District of New York |

## BRIEF OF THE APPELLEES

Marshall S. Huebner
(*marshall.huebner@davispolk.com*)
Benjamin S. Kaminetzky
(*ben.kaminetzky@davispolk.com*)
James I. McClammy
(*james.mcclammy@davispolk.com*)
Marc J. Tobak
(*marc.tobak@davispolk.com*)
Eric M. Kim
(*eric.kim@davispolk.com*)

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
*Counsel to the Debtors-Appellees
and Debtors in Possession*

## CORPORATE DISCLOSURE STATEMENT

Purdue Pharma L.P. ("PPLP") and its affiliates that are debtors and debtors in possession in the above-captioned chapter 11 proceedings (collectively, the "Debtors"), by and through undersigned counsel, respectfully represent:

1.     Non-Debtor Pharmaceutical Research Associates L.P. directly owns 100% of the ownership interests of Purdue Pharma L.P.  Non-Debtor PLP Associates Holdings L.P. directly owns approximately 99.5061% of the ownership interests of Pharmaceutical Research Associates L.P.   Non-Debtor BR Holdings Associates L.P. directly owns 100% of the ownership interests of PLP Associates Holdings L.P.   Non-Debtor Beacon Company and non-Debtor Rosebay Medical Company L.P. each directly owns 50% of the ownership interests of BR Holdings Associates L.P.  Non-Debtor Heatheridge Trust Company Limited, as Trustee under Settlement dated December 31, 1993, directly owns 100% of the ownership interests of Beacon Company.  Non-Debtor Richard S. Sackler, M.D., and Cedar Cliff Fiduciary Management Inc., as Trustees under Trust Agreement dated November 5, 1974, directly own 98% of the ownership interests of Rosebay Medical Company L.P.  To the best of the Debtors' knowledge and belief, none of these entities is publicly held, and no other person or entity directly or indirectly owns 10% or more of the ownership interests of PPLP.

2.      Non-Debtor Banela Corporation directly owns 50% of the ownership interests of Debtor Purdue Pharma Inc. ("PPI"); non-Debtor Linarite Holdings LLC directly owns 25% of the ownership interests of PPI; and non-Debtor Perthlite Holdings LLC directly owns 25% of the ownership interests of PPI. Non-Debtor Millborne Trust Company Limited, as Trustee of the Hercules Trust under Declaration of Trust dated March 2, 1999, directly owns 100% of the ownership interests of Banela Corporation.  Non-Debtor Data LLC, as Trustee under Trust Agreement dated December 23, 1989, directly owns 100% of the ownership interests of Linarite Holdings LLC. Non-Debtor Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated December 23, 1989, directly owns 100% of the ownership interests of Perthlite Holdings LLC.  To the best of the Debtors' knowledge and belief, none of these entities is publicly held, and no other person or entity directly or indirectly owns 10% or more of the ownership interests of PPI.

3.      PPLP directly owns 100% of the ownership interests of Debtors Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Products L.P. (f/k/a Avrio Health L.P.), Purdue Pharmaceutical Products L.P., Nayatt Cove Lifescience Inc., and Rhodes Associates L.P.  PPLP directly

owns 99% of the ownership interests of Debtor Purdue Neuroscience Company.

PPI directly owns the remaining 1% of the ownership interests of Purdue

Neuroscience Company.

4.      Debtor Rhodes Associates L.P. directly owns 100% of the ownership

interests of Debtors Paul Land Inc., Rhodes Pharmaceuticals L.P., and Rhodes

Technologies.

5.      Debtor Rhodes Technologies directly owns 100% of the ownership

interests of Debtor UDF LP and Debtor SVC Pharma Inc.

6.      Debtor UDF LP directly owns 100% of the ownership interests of

Debtor Button Land L.P. and Debtor Quidnick Land L.P.  UDF LP directly owns

99% of the ownership interests of Debtor SVC Pharma LP.  SVC Pharma Inc.

directly owns the remaining 1% of the ownership interests of SVC Pharma LP.

7.      Debtor Seven Seas Hill Corp. and Debtor Ophir Green Corp. each

directly owns 50% of the ownership interests of Debtor Purdue Pharma of Puerto

Rico.

# TABLE OF CONTENTS

PAGE

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

JURISDICTIONAL STATEMENT .........................................................................1

COUNTER STATEMENT OF ISSUES ON APPEAL ..........................................2

STANDARD OF REVIEW ON APPEAL ..............................................................3

INTRODUCTION ..................................................................................................4

STATEMENT OF THE CASE................................................................................7

    A.    Background and Procedural History of the Chapter 11 Proceedings and the Preliminary Injunction ..........................................7

        1.    The Tidal Wave of Litigation Against the Debtors ...................8

        2.    The Debtors Request a Preliminary Injunction to Preserve Estate Value and Foster an Equitable Resolution ........9

        3.    The District Court Affirms the Bankruptcy Court's Decision Granting the Preliminary Injunction..........................12

    B.    The Bankruptcy Court Confirms a Plan of Reorganization Later Affirmed by the Second Circuit .........................................................14

    C.    Appellant Files a Copycat Complaint Against the Sacklers in December 2022, Which Is Subsequently Enjoined by the Bankruptcy Court in February 2023 ..................................................18

        1.    The Bankruptcy Court Enjoins Appellant's Complaint............20

        2.    The Thirty-Second Amended PI Order Expires, Mooting This Appeal .................................................................................22

SUMMARY OF ARGUMENT ..............................................................................23

ARGUMENT .........................................................................................................25

I.     THIS APPEAL IS MOOT BECAUSE THE BANKRUPTCY COURT ORDER ON APPEAL HAS EXPIRED AND BEEN SUPERSEDED ........25

II.    THE BANKRUPTCY COURT HAS SUBJECT MATTER JURISDICTION TO ENJOIN APPELLANT'S LAWSUIT ......................28

III.   THE BANKRUPTCY COURT CORRECTLY DETERMINED THAT ENJOINING APPELLANT'S LAWSUIT IS APPROPRIATE UNDER SECTION 105(A) ..........................................................................31

A.    The Appellees Have Reasonable Prospects for a Successful Reorganization......................................................................36

B.    Prosecution of Appellant's Suit Would Irreparably Harm the Estates, Their Creditors, and the Debtors' Prospects for Reorganization......................................................................39

    1.    Appellant's Lawsuit Is Virtually Indistinguishable from Governmental Suits Enjoined Since October 2019 .................40

    2.    Prosecution of Appellant's Lawsuit Will Burden the Estates with Monetary and Non-Monetary Costs....................43

    3.    Prosecution of Appellant's Complaint Threatens to Irreparably Injure the Value of the Estates' Most Valuable Assets.........................................................................45

    4.    Prosecution of Plaintiff's Complaint Threatens Equitable Distribution of the Estates and to Restart the Value-Destructive Litigation Landscape .............................................48

C.    The Balance of Equities and Public Interest Both Weigh Heavily in Favor of Enjoining Appellant's Complaint ......................49

IV.    APPELLANT'S BELATEDLY RAISED CLAIM OF SOVEREIGN IMMUNITY PRESENTS NO OBSTACLE TO THE PRELIMINARY INJUNCTION ..................................................................51

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Adler v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*,
    855 F.3d 459 (2d Cir. 2017) ...................................................................... 3

*Anderson v. City of Bessemer*,
    470 U.S. 564 (1985) .................................................................................. 3

*Androse Assocs. of Allaire, LLC v. Great Atl. & Pac. Tea Co., Inc. (In re Great Atl. & Pac. Tea Co.)*,
    472 B.R. 666 (S.D.N.Y. 2012) ............................................................... 52

*Browning v. Navarro*,
    743 F.2d 1069 (5th Cir. 1984) ............................................................... 32

*Caesars Ent. Operating Co. v. BOKF, N.A. (In re Caesars Ent. Operating Co., Inc.)*,
    808 F.3d 1186 (7th Cir. 2015) ............................................................... 32

*Canter v. Canter (In re Canter)*,
    299 F.3d 1150 (9th Cir. 2002) ............................................................... 32

*Carlton v. Firstcorp, Inc.*,
    963 F.2d 942 (4th Cir. 1992) ................................................................. 32

*Catanzarite v. GCL, LLC (In re Daymark Realty Advisors, Inc.)*,
    No. 21-12766, 2022 WL 703963 (11th Cir. Mar. 9, 2022) .................... 32

*Celotex Corp. v. Edwards*,
    514 U.S. 300 (1995) ................................................................................ 28

*Chao v. Hosp. Staffing Servs., Inc.*,
    270 F.3d 374 (6th Cir. 2001) ................................................................. 32

*Cont'l Ill. Nat. Bank & Tr. Co. v. Chi., Rock Island & Pac. Ry. Co.*,
    294 U.S. 648 (1935) ................................................................................ 34

*Coporacion de Servicios Medicos Hospitalarios de Fajardo v. Mora (In re Coporacion de Servicios Medicos Hospitalarios de Fajardo)*,
    805 F.2d 440 (1st Cir. 1986) ................................................................. 32

*E. Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc).*,
   111 B.R. 423 (Bankr. S.D.N.Y. 1990) .............................................................. 33

*Elliot v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
   829 F.3d 135 (2d Cir. 2016) ..................................................................... 3

*Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litig.)*,
   765 F.2d 343 (2d Cir. 1985) ..................................................................... 31

*Harrington v. Purdue Pharma L.P.*,
   No. 23-124, 2023 WL 5116031 (Aug. 10, 2023) ................................................ 17

*In re Fairfield Sentry Ltd.*,
   No. 10 Civ. 7311 (GBD), 2011 WL 4357421 (S.D.N.Y. Sept. 16, 2011) .......... 2

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*,
   143 S.Ct. 1689 (2023) ......................................................................... 53

*Lautenberg Found. v. Picard (In re Bernard L. Madoff Inv. Secs., LLC)*,
   512 F. App'x 18 (2d Cir. 2013) ................................................................ 32-33

*Law v. Siegel*,
   571 U.S. 415 (2014) ............................................................................ 34

*Loewi Realty Corp. v. Chanticleer Assocs. (In re Chanticleer Assocs.)*
   592 F.2d 70 (2d Cir. 1979) ..................................................................... 34

*Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*,
   402 B.R. 571 (Bankr. S.D.N.Y. 2009) ......................................................... 36, 39

*MacArthur Co. v. Johns-Manville Corp.*,
   837 F.2d 89 (2d Cir. 1988) ..................................................................... 31-32

*Nevada Power Co. v. Calpine Corp. (In re Calpine)*,
   365 B.R. 401, 409 (S.D.N.Y. 2007) ............................................................ 36

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*,
   351 F.3d 86 (2d Cir. 2003) ..................................................................... 34

*New York City Emps. Ret. Sys. v. Ebbers (In re WorldCom, Inc. Sec. Litig.)*,
   293 B.R. 308 (S.D.N.Y. 2003) .................................................................. 29

*Penn Terra Ltd. v. Dep't of Env't Res., Com. of Pa.*,
   733 F.2d 267 (3d Cir. 1984) ............................................................... 32

*Pfizer Inc. v. Law Offs. of Peter G. Angelos (In re Quigley Co.)*,
   676 F.3d 45 (2d Cir. 2012) ................................................................ 28

*Picard v. Fairfield Greenwich Ltd.*,
   762 F.3d 199 (2d Cir. 2014) ................................................................ 3

*In re Purdue Pharma L.P.*,
   69 F.4th 45 (2d Cir. 2023) ......................................................... *passim*

*Sester v. United States*,
   566 U.S. 231 (2012) ......................................................................... 53

*Siemon v. Emigrant Sav. Bank (In re Siemon)*,
   421 F.3d 167 (2d Cir. 2005) (per curiam) ......................................... 26

*SPV Osus Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018) ...................................................... *passim*

*Missouri v. U.S. Bankr. Ct. for E. D. of Ark. (In re Missouri)*,
   647 F.2d 768 (8th Cir. 1981) ............................................................ 32

*Sterling v. Carlebach*,
   690 F. App'x 747 (2d Cir. 2017) ...................................................... 26

*United States v. Menasche*,
   348 U.S. 528 (1955) ......................................................................... 53

*Video Tutorial Servs. v. MCI Telecomm. Corp.*,
   79 F.3d 3 (2d. Cir 1996) .............................................................. 26-27

*WPIX, Inc. v. ivi, Inc.*,
   691 F.3d 275, 278 (2d Cir. 2012) ....................................................... 3

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
   386 B.R. 17 (Bankr. D. Del. 2008) ................................................... 36

## STATUTES & RULES

11 U.S.C. § 105 ........................................................................ *passim*

11 U.S.C. § 106 ........................................................................ 52-53

11 U.S.C. § 362 ................................................................................... *passim*

11 U.S.C. § 524(g) ..................................................................................... 34

28 U.S.C. § 157(b) ....................................................................................... 1

28 U.S.C. § 158 .................................................................................. 1, 2, 26

28 U.S.C. § 1334 ............................................................................... *passim*

Fed. R. Bankr. P. 8002(a)(1) ............................................................. 2, 26-27

Fed. R. Evid. 201(b) ..................................................................................... 2

O<small>THER</small> A<small>UTHORITIES</small>

S. Rep. No. 95-989 (1978) ...........................................................................34

# JURISDICTIONAL STATEMENT

This is an appeal from the now expired and superseded Thirty-Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction ("Thirty-Second Amended PI Order"), which the U.S. Bankruptcy Court for the Southern District of New York (Hon. Sean H. Lane) ("Bankruptcy Court") entered on February 7, 2023.

The Bankruptcy Court correctly determined that it had subject matter jurisdiction to temporarily enjoin Appellant's pursuit of claims against the Debtors' related parties pursuant to 28 U.S.C. §§ 157(b) and 1334(b). Those statutes provide for "related to" bankruptcy jurisdiction over suits that "might have any conceivable effect on the bankrupt estate." *In re Purdue Pharma L.P.*, 69 F.4th 45, 71 (2d Cir. 2023) (quoting *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339-340 (2d Cir. 2018)). Appellant's enjoined lawsuit might have, at a minimum, "conceivable effects" on the Debtors' estates because it shares a high degree of interconnectedness with claims against the Debtors, will irreparably harm the Debtors and their estates, and might give rise to indemnification and contribution claims against the Debtors. *See* Argument, Part II, *infra*.

This Court had jurisdiction over this appeal under 28 U.S.C. § 158(a)(1) when Appellant filed the Notice of Appeal on February 23, 2023 (Dkt. No. 1). The order on appeal expired as of June 29, 2023 (JA2776-77 (Thirty-Second Amended

PI Order) at 11-12)), and was superseded by a subsequent order entered by the

Bankruptcy Court on July 12, 2023 (*see* SPA074 (Thirty-Third Amended Order

Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction,

*Purdue Pharma L.P. v. Commonwealth of Massachusetts*, Adv. Pro. No. 19-08289

(SHL) (July 12, 2023) [Dkt. No 432] ("Thirty-Third Amended PI

Order")).)[1]  Appellant did not file a notice of appeal from the Thirty-Third

Amended PI Order until August 11, 2023 (SPA089), more than two weeks after the

deadline to do so expired on July 26, 2023.  28 U.S.C. §158(c)(2); Fed. R. Bankr.

P. 8002(a)(1).  Because the order on appeal has expired and Appellant failed to

timely appeal from the superseding order, appellate jurisdiction no longer exists,

and the appeal should be dismissed.  *See* Argument, Part I, *infra*.

## COUNTER STATEMENT OF ISSUES ON APPEAL

1.  Did the Bankruptcy Court (Hon. Sean H. Lane) properly conclude that
    Appellant's litigation against former executives and board members of
    Debtor Purdue Pharma, L.P., arising out of their alleged control and
    direction of the Debtors, might have "any conceivable effect" on the
    Debtors' bankruptcy estates such that the Bankruptcy Court could

---

[1] "SPA" refers to the Debtors' Supplemental Appendix filed in conjunction
herewith.  SPA039, 068, 074, and 089 of the Debtors' Supplemental Appendix,
which post-date the designation of the record on appeal, are documents publicly
filed in the proceedings below or in appeals therefrom, and thus subject to judicial
notice.  Fed. R. Evid. 201(b); *In re Fairfield Sentry Ltd.*, No. 10 Civ. 7311 (GBD),
2011 WL 4357421, at *7 n.6 (S.D.N.Y. Sept. 16, 2011).

exercise subject matter jurisdiction under 28 U.S.C. § 1334(b) to preliminarily enjoin Appellant from pursuing its claims?

2.     Did the Bankruptcy Court abuse its discretion in preliminarily enjoining Appellant from prosecuting its claims, under 11 U.S.C. § 105(a), to avert imminent and irreparable harm to the Debtors' reorganization?

## STANDARD OF REVIEW ON APPEAL

A bankruptcy court's legal conclusions, including a determination that it has subject matter jurisdiction, are reviewed de novo. *See Elliot v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 152 (2d Cir. 2016). A bankruptcy court's decision to grant or deny a preliminary injunction is reviewed for an abuse of discretion. *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 206 (2d Cir. 2014). A bankruptcy court abuses its discretion only where "its decision rests on an error of law or a clearly erroneous factual finding, or when its decision cannot be located within the range of permissible decisions." *Id*. (quoting *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278 (2d Cir. 2012). A finding of fact is clearly erroneous only if this Court is "left with the definite and firm conviction that a mistake has been committed." *Adler v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*, 855 F.3d 459, 469 (2d Cir. 2017) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)).

## INTRODUCTION

Appellant, the Lac La Ronge Indian Band, a single Canadian First Nation located in Saskatchewan, Canada, asks this Court to overrule Supreme Court and Second Circuit precedent, depart from Judge McMahon's decision in an earlier appeal from the preliminary injunction ("Preliminary Injunction"), set aside the extensive factual findings of Judge Lane and Judge Drain, and put at risk a series of settlements and a plan of reorganization ("Plan") that took years to negotiate and provides billions of dollars for opioid abatement and victim compensation. Appellant asks this Court to do so to allow Appellant (and Appellant alone) to leapfrog Purdue's hundreds of thousands of other creditors and more than 2,600 other lawsuits (including lawsuits filed by nearly every state and territory of the United States, the District of Columbia, and thousands of tribes, municipalities, hospitals, third-party payors, school districts, and individual victims) filed years before Appellant filed its copycat lawsuit.  This is despite the fact that, as a Canadian entity, Appellant is free under the Plan to pursue claims against non-debtor Purdue Canada (the entity that sold and marketed opioids in Canada) and against the Sacklers for conduct related to Purdue Canada.

To achieve this capricious and inequitable outcome, Appellant argues that the Bankruptcy Court lacked subject matter jurisdiction and statutory authority to enjoin Appellant from prosecuting its claims; that enjoining Appellant was an

abuse of the Bankruptcy Court's discretion; and that Appellant's supposed tribal sovereign immunity has not been abrogated or waived, and thus bars the injunction. Appellant woefully fails at each and every step.

First, Appellant has mooted this appeal through its lack of diligence. The order on appeal expired on June 29, 2023, and thus Appellant cannot secure any relief from that order. While a new order was entered on July 12, 2023, there is no appellate jurisdiction over that order because Appellant did not file a notice of appeal until more than two weeks after the deadline to do so had passed.

Second, there is no room to doubt that the Bankruptcy Court has subject matter jurisdiction. Just weeks ago, the Second Circuit rejected this Appellant's challenge to a related exercise of jurisdiction over Appellant's claims, holding bankruptcy jurisdiction extends to any claim that might have a "conceivable effect" on the Debtors' estates and that such effects were amply demonstrated by the record. The Bankruptcy Court's factual finding that Appellant's claims would irreparably injure the Debtors and their estates far exceeds the potential "conceivable effect" necessary to exercise jurisdiction.

Third, longstanding and binding Second Circuit precedent holds that Section 105(a) of the Bankruptcy Code means exactly what it says: Section 105(a) empowers bankruptcy courts to issue "any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code, including by enjoining a

creditor's suit against a non-debtor when needed to protect its jurisdiction to carry out the Code, and upon a showing of the familiar four factors necessary for a preliminary injunction.

Fourth, the Bankruptcy Court's decision to enjoin Appellant from prosecuting its suit was a sound exercise of its discretion, rooted in detailed and specific findings of fact.  After reviewing a record developed in a full-day evidentiary hearing on the Preliminary Injunction in 2019, a six-day, 41-witness confirmation trial in 2021, and fulsome briefing and argument on Appellant's objection to the Preliminary Injunction, the Bankruptcy Court found that each of the four relevant factors weighed in favor of issuing the injunction.  Critically, the Bankruptcy Court found that prosecution of Appellant's suit would irreparably harm the Debtors and their creditors by imposing litigation costs on the estates, threatening to devalue estate claims and topple the multibillion-dollar resolution of those (and other) claims, and opening the floodgates to the chaotic litigation free-for-all that swamped the Debtors before the Preliminary Injunction issued in 2019.

Lastly, Appellant cannot shield itself from the Preliminary Injunction by belatedly invoking sovereign immunity.  That argument is waived on appeal because Appellant did not raise it below.  In any case, it is meritless because the Bankruptcy Code abrogates any and all governmental immunity with respect to Section 105(a) of the Code and because Appellant waived whatever sovereign

immunity it might have had by voluntarily participating in this bankruptcy—as the Second Circuit recently held.

For all of these reasons, and for all of the reasons set forth below, the Bankruptcy Court's decision should be affirmed.

## STATEMENT OF THE CASE[2]

### A.   Background and Procedural History of the Chapter 11 Proceedings and the Preliminary Injunction

The Debtors are pharmaceutical companies.  They manufacture, among other things, FDA-approved abuse-deterrent, opioid medications, including OxyContin.  At present, they are ultimately owned by trusts for the benefit of members of the families of Raymond and Mortimer Sackler (collectively, the "Sackler Families" or the "Sacklers").  (JA4682 (D. Ct. Decision and Order on Appeal ("D. Ct. Order")) at 10.)  While certain members of the Sackler Families had served as officers or directors of Purdue in the past, no Sackler has served on the board or in any other role at Purdue since early 2019.  (*Id.*)

Trusts for the benefit of the Sackler Families are also the ultimate owners of a pharmaceutical business in Canada ("Purdue Canada").  Purdue Canada is not a Debtor, and is not a parent or subsidiary of any Debtor.  (JA4707 (D. Ct. Order) at

---

[2] Debtors have not attempted to correct every factual misstatement in Appellant's brief, and do not accept the validity of any assertion in Appellant's brief by declining to correct it here.

35 n.29; *see also* App. Br. at 15)   Purdue Canada was responsible for the manufacture, distribution, and sale of products in Canada.  (*See* App. Br. at 15.) The Debtors do not distribute or sell any medications in Canada.

### 1.    The Tidal Wave of Litigation Against the Debtors

As of the Debtors' bankruptcy filing in September 2019, over 2,600 lawsuits had been filed against the Debtors alleging that they acted improperly in the marketing and sale of opioids, and seeking damages based on public nuisance, consumer protection laws, unjust enrichment, false claims acts, and similar theories.  (*See* JA4826-27 (Decision and Order Affirming the Bankruptcy Court's Preliminary Injunctions ("*Dunaway* Decision")) at 1-2.)  Many of these lawsuits also named members of the Sackler Families as defendants.  Those suits asserted claims against the Sacklers that are substantially similar—and often identical—to the claims asserted against the Debtors, based on allegations that the Sacklers played an active role in causing and/or directing the alleged misconduct of the Debtors.  (JA4844 (*Dunaway* Decision) at 19); JA1043 (Declaration of Hayden A. Coleman in Supp. Debtors' Motion for Preliminary Injunction ("Coleman Decl.")) ¶ 18.)

By mid-2019, the thousands of plaintiffs prosecuting these actions against the Debtors and the Sacklers were locked in a race to the courthouse, in which private and governmental plaintiffs contrived ever-more-creative ways to jump

ahead of others, in almost every conceivable forum, from state administrative

proceedings to the original jurisdiction of the Supreme Court.  (JA1233, 1243

(Oct. 11, 2019 Hr'g Tr.) 43:5-14, 267:7-10.)  It also became clear that defending

against these thousands of lawsuits across the country would result in the Debtors'

financial and operational ruin, leaving nothing for victims to recover.  (*See* JA700

(Declaration of Jamie O'Connell in Supp. Debtors' Motion for Preliminary

Injunction ("O'Connell Decl.")) ¶ 22.)  Bankruptcy offered the only viable solution

to halt the destruction of the company and to facilitate a value-maximizing and

equitable global resolution.

### 2.     The Debtors Request a Preliminary Injunction to Preserve Estate Value and Foster an Equitable Resolution

While a bankruptcy filing typically halts such a value-destroying and

inequitable litigation dynamic through the statutory automatic stay, the Debtors

here required additional relief.  Over 85% by number of the plaintiffs in the

prepetition suits were governmental entities asserting (like Appellant) claims such

as public nuisance or violation of consumer protection or unfair competition

statutes.  (JA639 (Mem. in Support of Preliminary Injunction (Sept. 18, 2019) at

3.)  The Debtors thus anticipated that governmental litigants would argue that the

so-called police power exception to the automatic stay under 11 U.S.C. § 362(b)(4)

applied to their claims.  Claims against certain of the Debtors' current and former

owners, officers, directors, employees, and associated entities, such as the Sacklers

(collectively, the "Related Parties") are not subject to the automatic stay, and would therefore continue to drain the Debtors' resources and deplete the estates' assets.

The Debtors thus sought to enjoin the litigation pending against both the Debtors and Related Parties pursuant to the Bankruptcy Court's broad equitable powers under 11 U.S.C. § 105(a). (*See* JA120 (Preliminary Injunction Compl. (Sept. 18, 2019)).) The Debtors sought this stay to stem the rapid depletion of estate resources, and to provide the respite needed to continue to develop a confirmable plan of reorganization. The statutory Official Committee of Unsecured Creditors and the Ad Hoc Group of Governmental and Other Contingent Litigation Claimants supported the stay, but other creditors—led by a group of state attorneys general not members of the Ad Hoc Group—vigorously opposed it. Like Appellant, the opposing states argued that they should not be enjoined because they had sued under their respective state unfair competition laws.[3]

On October 11, 2019, after expedited document and deposition discovery and briefing, the Bankruptcy Court held a full-day evidentiary hearing on the

---

[3] *See, e.g.*, (JA707 (States' Coordinated Opp. to the Debtors' Preliminary Injunction Mot.) at 25 ("Every State has adopted a statute prohibiting unfair and deceptive practices in business ('UDAP' laws)."))

Preliminary Injunction.  At the conclusion of the hearing, the Bankruptcy Court

entered an order conditionally granting the Preliminary Injunction through

November 6, 2019.  (*See* JA1198 (Amended PI Order).)  Following another

hearing on November 6, 2019, the Bankruptcy Court entered a final order granting

the Preliminary Injunction through April 8, 2020.  (*See* JA1210 (Second Amended

PI Order.)

The Bankruptcy Court's decision to impose the Preliminary Injunction

rested on an extensive and uncontroverted evidentiary record demonstrating that

the Debtors and their prospects of reorganization would be irreparably harmed if

the uncoordinated litigation continued.  Among the key facts presented to the

Bankruptcy Court were:

- The Debtors were projected to spend hundreds of millions of dollars on legal fees and expenses in 2019, the vast majority of which directly related to defending against the thousands of opioid-related lawsuits across the country (JA1233-34 (Oct. 11, 2019 Hr'g Tr.) 43:15-44:12; JA698-99 (O'Connell Decl.) ¶ 16);

- Financial costs aside, the time and energy required to monitor, manage, and direct the Debtors' response to the litigation was also enormous, and detracted from the business more generally (JA1234 (Oct. 11, 2019 Hr'g Tr.) 44:13-20; JA686-87 (Declaration of Jesse DelConte in Supp. Debtors' Motion for Preliminary Injunction ("DelConte Decl.")) ¶¶ 7, 9, 10);

- Because the claims against Related Parties are inextricably intertwined with those against the Debtors and arise from allegations concerning Related Parties' conduct while affiliated with the Debtors, the Debtors had been—and would continue to be—a target of discovery on such claims because they possess

11

the bulk of the documents and evidence potentially relevant to those claims (JA1056-58 (Coleman Decl.) ¶¶ 31-37; JA1235-36 (Oct. 11, 2019 Hr'g Tr.) 59:20-60:18); and

- Moreover, because many of the claims against Related Parties overlapped claims owned by the Debtors' estates, allowing other creditors to proceed (and potentially prevail) on those claims against the Related Parties could result in "fewer dollars [being] available for" recoveries to the Debtors' estates. (SPA145-46 (Oct. 11, 2019 Hr'g Tr.) 61:6-62:14.)

Based on these findings, the Bankruptcy Court determined that the circumstances weighed heavily in favor of issuing an injunction under Section 105(a), including because "material" costs attendant to the "continued pursuit of litigation . . . would materially and adversely affect the Debtors' chapter 11 process and estates" and because allowing even just one governmental lawsuit to proceed against the Debtors or their Related Parties would lead to "an inevitable . . . desire by multiple other governmental entities to vindicate" their near-identical claims.  (JA1239-40 (Oct. 11, 2019 Hr'g Tr.) at 255:18-256:6.)

### 3.   The District Court Affirms the Bankruptcy Court's Decision Granting the Preliminary Injunction

Shortly thereafter, the order granting the Preliminary Injunction was appealed by five district attorneys from the state of Tennessee (and an infant born dependent on opioids)—plaintiffs in a lawsuit against Dr. Richard Sackler for damages arising out of the Debtors' marketing and sale of opioids (the "*Dunaway* Action").  (JA4828-29 (*Dunaway* Decision) at 3-4.)  Like Appellant, the *Dunaway*

appellants argued that the Bankruptcy Court lacked jurisdiction to enjoin an action

brought by governmental actors against a non-debtor third party and that, even if

the Bankruptcy Court has such jurisdiction, the Bankruptcy Court abused its

discretion in granting the Preliminary Injunction.  *Id.*

On August 11, 2020, the District Court (Hon. Colleen McMahon) issued an

opinion rejecting both arguments and affirming the Bankruptcy Court.  (JA4828

(*Dunaway* Decision) at 3.)  The District Court held that "related to" bankruptcy

jurisdiction under 28 U.S.C. § 1334 extends to "every case where 'the action's

outcome might have any conceivable effect on the bankrupt estate.'"  (JA4829

(*Dunaway* Decision) at 14 (quoting *SPV Osus*, at 339-40).)  Thus, the Bankruptcy

Court was "correct to conclude that Appellants' claims against Dr. Sackler are

'related to' the bankruptcy proceeding."  (JA4840 (*Dunaway* Decision) at 15.)  The

District Court also held that Section 105(a) "is properly used to enjoin creditors'

lawsuits against third parties where the injunction plays an important part in the

debtor's reorganization plan or where the action to be enjoined will have an

immediate adverse economic consequence for the debtor's estate" (JA4856

(*Dunaway* Decision) at 31), and affirmed the Bankruptcy Court's decision to grant

the Preliminary Injunction because each of the four factors commonly used by

courts in the Second Circuit to evaluate whether to issue an injunction under

Section 105(a) were met.  (JA4856-64 (*Dunaway* Decision) at 31-39.)

B.     **The Bankruptcy Court Confirms a Plan of Reorganization Later Affirmed by the Second Circuit**

With the benefit of the litigation standstill afforded by the Preliminary Injunction, for the next two years, the Debtors and their numerous governmental and non-governmental creditor constituencies undertook to improve upon a settlement framework negotiated prepetition and to build upon its initial creditor support.  An enormous amount of information was produced—the Debtors alone provided over 90 million pages of documents—to allow the parties to assess potential claims against the Sacklers and their associated entities.  (JA4508-09 (Bankr. Ct. Modified Bench Ruling ("MBR")) at 78-79.)  And the parties engaged in a series of mediated negotiations led by three of the nation's most respected mediators in an effort to resolve allocation issues among Purdue's creditors and determine whether a satisfactory agreement with the Sacklers could be reached.  *In re Purdue Pharma L.P.*, 69 F.4th at 60-61.  These intense efforts culminated in the settlement agreements reflected in the Debtors' overwhelmingly supported reorganization plan.  Under the terms of the current settlement, the Sacklers will pay at least $5.5 billion (and up to $6 billion) to trusts established solely for the purpose of funding opioid abatement programs across the country, as well as to compensate victims of the opioid epidemic.  *Id.* at 81.

The Plan that emerged from this yearslong process was, in the words of the Official Committee of Unsecured Creditors, "the creditors' Plan, reflecting the

14

creditors' compromises, and designed to further the creditors' interests." (SPA098 (CA2 Reply of Appellant The Off. Comm. of Unsecured Creditors) at 9.)  The Plan has four key components.  <u>First</u>, the Plan embodies many critical and interlocking intercreditor settlement agreements reached during the three phases of mediation that together establish an historic, abatement-centric distribution framework.  *See In re Purdue Pharma L.P.*, 69 F.4th at 62; (JA4480, 4508 (MBR) at 50, 78.) <u>Second</u>, the Plan delivers on a critical commitment made by the Debtors at the outset of the chapter 11 cases: the creation of a public document repository. (JA4726 (D. Ct. Order) at 54.)  <u>Third</u>, the Plan requires substantially all of the Debtors' operating assets to be transferred to a new entity structured as a public benefit company dedicated to mitigating the opioid crisis.  (JA4476, 94 (MBR) at 46, 64.)  <u>Finally</u>, the Plan restricts the Sacklers from participating in any opioid business worldwide and contains a variety of other critical covenants and limitations.  *In re Purdue Pharma L.P.*, 69 F.4th at 62, 82.

The principal consideration that the Sacklers will receive for their settlement payments under the Plan is the release of certain actual or potential claims against parties associated with the Sackler Families.  These releases are integral to the settlements underlying the Plan and the Plan itself.  (JA4503 (MBR) at 73.) Indeed, all the major creditor groups represented to the Bankruptcy Court that they would not support a plan that permitted opt-outs to destroy what the vast majority

of creditors had worked for years to achieve.  (*See*, *e.g.*, SPA157, 166 (Aug. 23, 2021 Hr'g Tr.) 58:8-25, 120:9-22).  Allowing opt-outs could both provide opt-outs with grossly disproportionate recoveries ahead of all those who settled and deplete the Sacklers' assets, leaving them unable to pay the billions owed under the Plan's settlements.  (JA4571-73 (MBR) at 141-43.)

The final language governing the releases of the Sacklers and Related Parties is the result of extensive negotiation by creditors opposite the Sacklers—as well as significant further narrowing by the Bankruptcy Court.  (*See*, *e.g.*, JA4561 (MBR) at 131.)  The Plan's releases extend only to claims for which "any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor."  (JA4403-06 (Plan) § 10.7.)  And—critically—the Debtors and the provinces of Canada agreed to exclude from the release any claim that "arises out of or relates to" the conduct of non-debtor Purdue Canada and that is not "based upon any conduct of the Debtors."  (JA4288-89 (Plan) § 1.1 (defining "Excluded Claims").)

Despite the extraordinary consensus in support of the Plan—in the aggregate, over 95% of the ballots cast, including 97% of governmental creditors, voted in favor of the Plan (JA4439, 4470 (MBR) at 9, 40)—a small handful of creditors (including Appellant) objected to the Plan and later appealed from the Bankruptcy Court's order confirming the Plan (the "Confirmation Order").  Those

16

appeals resulted in the decision issued by the Second Circuit affirming the

Confirmation Order, *In re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023), which

will be reviewed by the Supreme Court, *Harrington v. Purdue Pharma L.P.*, No.

23-124, 2023 WL 5116031 (Aug. 10, 2023).  In those appeals, Appellant notably

raised many of the same arguments it is raising in this appeal, including, for

example:

- That the Bankruptcy Court exceeded its jurisdiction under 28 U.S.C. § 1334 and its authority under the Bankruptcy Code to release its claims under the Canadian Competition Act against the Sacklers, which Appellant expressly conceded were both "'related' to the Debtor, thus falling within Section 10.7(b) [of the Plan]," were "'based upon' the Debtors' conduct," and that "the Debtors' conduct is 'legally relevant' to that claim too" (SPA108, 117, 122 (CA2 Brief for Appellees/Cross-Appellants Canadian Creditors) at 19, 60, 65);

- That Section 524(g) of the Bankruptcy Code prohibited the use of injunctions against non-debtors in cases outside of the asbestos-litigation context, and, more broadly, created an adverse inference against the use of similar tools outside that specific context (SPA114 (CA2 Brief for Appellees/Cross-Appellants Canadian Creditors) at 25);

- That Appellant was entitled to sovereign immunity from the Bankruptcy Court's imposition of third-party releases, and that Section 106 of the Bankruptcy Code does not abrogate its sovereign immunity (SPA123-36) (CA2 Brief for Appellees/Cross-Appellants Canadian Creditors) at 73-68); and

- That the Plan's treatment of Appellant's bankruptcy claims was otherwise improper under the Bankruptcy Code (SPA137 (CA2 Brief for Appellees/Cross-Appellants Canadian Creditors) at 92.)

The Second Circuit rejected <u>every single one</u> of these arguments, stating that:

- The Bankruptcy Court had subject matter jurisdiction under 28 U.S.C. § 1334 because of "th[e] substantial overlap [between claims against the Debtors and the Sacklers], [such that] the litigation of third-party direct claims against the Sacklers would likely impact the Debtor's ability to pursue, and the likelihood of recovering on, the Estate's own claims against the Sacklers." *In re Purdue Pharma L.P.*, 69 F.4th at 72.

- The mere possibility that the Sacklers could seek indemnification for their liability against the Debtors (even if such indemnification was likely prohibited) provided an independent basis for the Bankruptcy Court's subject matter jurisdiction over Appellant's claims. *Id.*

- "[T]he Plan does not violate the sovereign immunity of [Appellant]" because such immunity was waived due to Appellant's "fully and voluntarily participat[ing]" in these chapter 11 proceedings. *Id.* at 84.

- The "substantive differences" between Canadian and domestic tribes were adequate reason to treat their bankruptcy claims differently under the Plan. *Id.* at 84-85.

In short, the Second Circuit "decide[d] all pertinent issues necessary to confirm the Plan" and affirmed "the bankruptcy court's approval of the Plan." *Id.* at 69.

**C.    Appellant Files a Copycat Complaint Against the Sacklers in December 2022, Which Is Subsequently Enjoined by the Bankruptcy Court in February 2023**

In December 2022—years after the filing of these chapter 11 cases and more than a year after confirmation of the Plan—Appellant filed its first-ever complaint against the Sacklers (the "Complaint"). (JA1722 (Compl.))  That Complaint, which asserts claims under the Canadian Competition Act and for public nuisance,

18

is predicated almost entirely on allegations regarding the Debtors' marketing and sale of prescription opioid medications in the United States, and is substantively indistinguishable from the proof of claim it filed against the Debtors' estates in July 2020 (JA2088 (Electronic Proof of Claim)) and from the hundreds of other actions filed years earlier by the Debtors' other governmental creditors against the Sacklers.

Most of the allegations in the Complaint refer to conduct by "Purdue," which the Complaint defines as Debtors Purdue Pharma L.P., Purdue Pharma Inc., and non-Debtor The Purdue Frederick Company, Inc, <u>but not Purdue Canada</u>.  (*See* JA1734-35 (Compl.) ¶ 49).  For example, the Complaint alleges that:

- "Members of the Sackler family were daily on site at **Purdue's** headquarters, controlling the management of their family business and all of its employees."  (JA1747 (Compl.) ¶ 110 (emphasis added).)

- "Richard Sackler, Kathe Sackler, Jonathan Sackler, Theresa Sackler, Mortimer D.A. Sackler, and Ilene Sackler have been aware since at least 1999 of potential liability for **Purdue**, and those **acting in concert with Purdue**, because of the addictive nature of OxyContin. With the intention of shielding from creditors the proceeds of their wrongdoing, they have **stripped out of Purdue and the Purdue-related Entities** each and every year hundreds of millions of dollars of profits from the sales of OxyContin and other opioid-containing medications, including a generic form of OxyContin sold by Rhodes Pharma. **All such transfers were and are fraudulent within the meaning of applicable fraudulent transfer statutes and case law**. . . ."  (JA1749-50 (Compl.) ¶ 121 (emphasis added).)

- "From 2001 to 2007, **Purdue** was investigated by 26 states and the U.S. Department of Justice.  Beginning in or about 2003, advised by Baker, who served as legal counsel to the entire **Purdue** organization

19

and the Sackler Families, all of the Sacklers who served as executives of **Purdue** resigned out of concern that they might be held personally liable for conduct on behalf of **Purdue** in which they had previously engaged and in which they expected and intended to continue to engage after their respective resignations." (JA1750 (Compl.) ¶ 122 (emphasis added).)

- "The Sackler Family Defendants knew about, allowed, and directed **Purdue's deception**. They oversaw **Purdue's scheme** to send sales representatives to visit doctors thousands of times. They oversaw **Purdue's scheme** to hire top prescribers to promote its opioids. They oversaw **Purdue's effort** to get more patients on higher doses of opioids for longer periods. They were aware of, allowed and directed the content of the messages conveyed in **Purdue's marketing**." (JA1754 (Compl.) ¶ 139 (emphasis added).)

- "The Sackler Family Defendants oversaw **Purdue's** sales representatives. Richard Sackler testified that the sales representatives were the main way that **Purdue** promoted its opioids. He testified that the key to getting doctors to prescribe and keep prescribing **Purdue** opioids was regular visits from the sales force." (JA1755 (Compl.) ¶ 141; *see also* JA1755-60 (Compl.) ¶¶ 142-55 (allegations that focus exclusively on conduct by the Debtors with no mention of Canadian conduct) (emphasis added).)

### 1. The Bankruptcy Court Enjoins Appellant's Complaint

On December 29, 2022, Debtors served Appellant with pleadings necessary to enjoin Appellant's newly filed litigation. Appellant objected to the imposition of the Preliminary Injunction, and following briefing and oral argument, the Bankruptcy Court issued a 41-page bench ruling on February 1, 2023 granting the Debtors' request to enjoin Appellant's Complaint. (JA2708-09 (Feb. 1, 2023 Hr'g Tr.) 7:24-8:3.) In doing so, the Bankruptcy Court found that the claims and allegations underlying Appellant's Complaint were inextricably intertwined with

the estates' own claims against the Sacklers, as well as the hundreds of previous

complaints against the Debtors and the Sacklers.  (JA2726-2734 (Feb. 1, 2023 Hr'g

Tr.) 25:24-33:13.)  The Bankruptcy Court therefore determined that allowing

Appellant to prosecute its Complaint would have a "conceivable effect" on the

Debtors' estates and that enjoining the Complaint fell within its "related to"

jurisdiction under 11 U.S.C. § 1334(b) and well-established Second Circuit

precedent.  (JA2719 (Feb. 1, 2023 Hr'g Tr.) 18:10-22.)

Consistent with its prior findings and the District Court's affirmance in

*Dunaway*, and based on the extensive record, the Bankruptcy Court also found that

the Debtors had adequately demonstrated that enjoining Appellant's Complaint

was appropriate under the four-factor test for issuing injunctions pursuant to

Section 105(a) of the Bankruptcy Code.  (JA2736 (Feb. 1, 2023 Hr'g Tr.)

35:19-21.)  In particular, the Bankruptcy Court found that the Debtors had

demonstrated that:

- The prospects for a successful reorganization in chapter 11 continued to be viable because of (1) the merits of the then-pending appeals before the Second Circuit concerning the Confirmation Order and (2) even "if the district court's reversal [of the Confirmation Order] is ultimately upheld," the likelihood that the Preliminary Injunction could provide the Debtors and their creditors with an opportunity to "negotiate[ a] global solution . . . with the guidance of any [further] decisions on appeal."  (JA2725 (Feb. 1 2023 Hr'g Tr.) 24:11-18.)

- Lifting the Preliminary Injunction, even if only as to a single claimant (such as Appellant), risked imminent and irreparable harm to the Debtors' estates and their stakeholders for several reasons, including,

among other things, (1) the extensive and uncontroverted evidence showing the enormous monetary and non-monetary costs that were imposed on the Debtors from having to defend against thousands of lawsuits across the country; (2) the risk that allowing one exception to the Preliminary Injunction would engulf the Debtors and the courts with potentially thousands of "me too" appeals by similarly situated creditors seeking similar exceptions from the Preliminary Injunction; (3) and the risk that the Sacklers might walk away from the Plan and the billions of dollars they would otherwise contribute to the Debtors' estates for nationwide opioid abatement and victim compensation. (JA2726-34 (Feb. 1, 2023 Hr'g Tr.) 25:24-33:13.)

- For many of the same reasons, the balance of equities and public interest favored extending the Preliminary Injunction to enjoin Appellant's Complaint, including that not doing so would (1) be fundamentally unfair to the thousands of other creditors who have been subject to the Preliminary Injunction since the beginning of the chapter 11 cases, and (2) risk reopening the litigation floodgates and threatening the critically needed opioid abatement and victim compensation funding contemplated under the Plan. (JA2734-36 (Feb. 1, 2023 Hr'g Tr.) 33:14-35:18.)

Accordingly, the Bankruptcy Court entered the Thirty-Second Amended PI Order. (JA2766.)  Appellant filed its Notice of Appeal from the Thirty-Second Amended PI Order on February 21, 2023.  (JA3054.)

## 2.    The Thirty-Second Amended PI Order Expires, Mooting This Appeal

By its terms, the Thirty-Second Amended PI Order expired on June 29, 2023.  (JA2779 (Thirty-Second Amended PI Order) at 14.)  On June 15, 2023, the Debtors filed a motion seeking entry of a Thirty-Third Amended PI Order further extending the Preliminary Injunction.  (SPA039.)  In response to Appellant's objection to that motion raising questions about the impact of such an order on this

appeal, the Debtors represented to the Bankruptcy Court that they "would not argue that [Appellant] waived the right to raise on appeal any argument that it raised in the pleadings and hearings" relating to the entry of the prior order. (SPA071 (Debtors' Reply) at 3.)  But Debtors also cautioned Appellant that this Court, not the Bankruptcy Court, would "determine the consequences of the expiration of the Thirty-Second Amended Order on [this] District Court Appeal [and] whether [Appellant] properly perfects its appellate rights from any order further extending the Preliminary Injunction." (*Id.*)  The Bankruptcy Court agreed, acknowledging that it does not "have any ability to affect [Appellant's] appellate rights." (SPA171 (June 29, 2023 Hr'g Tr.) 17:2-19.)

The Bankruptcy Court entered the Thirty-Third Amended PI Order on July 12, 2023.  (SPA074.)  The 14-day period to appeal expired on July 26, 2023. Despite representing in its brief that it was aware of the expiration of the Thirty-Second Amended PI Order, that it would file a Notice of Appeal with respect to the Thirty-Third Amended PI Order, and that it would seek to consolidate the new appeal with this one (App. Br. at 11 n.3), Appellant did not file a notice of appeal with respect to the Thirty-Third Amended Order until August 11, 2023 (SPA039.)

## SUMMARY OF ARGUMENT

This appeal should be dismissed as moot.  The order appealed from, the Thirty-Second Amended PI Order, expired on June 29, 2023.  While the

Preliminary Injunction continues under the Thirty-Third Amended PI Order, Plaintiffs failed to timely file a notice of appeal with respect to that order, depriving this Court of jurisdiction to hear any appeal from it.

Should this Court nonetheless reach the merits, it is still clear that the Bankruptcy Court's decision to temporarily enjoin Appellant from pursuing claims against the Sacklers is correct, supported by the record, and should be affirmed, just as the District Court (Hon. Colleen McMahon) affirmed the Preliminary Injunction in *Dunaway*.   (JA4838-51 (*Dunaway* Decision) at 13-26.)  Appellant's claims are squarely within 28 U.S.C. § 1334's broad grant of bankruptcy jurisdiction over claims that have "any conceivable effect" on the estate.  The Bankruptcy Court found that Appellant's claims rest on acts or omissions that the Sacklers allegedly directed, caused, or oversaw in their roles as directors and officers of the Debtors, that they are inextricably linked with claims against the Debtors and the Debtors' claims against the Sacklers, and that Appellant's pursuit of those claims now would irreparably harm the estates—readily proving that the claims have at least a "conceivable effect" on the estates.

The Bankruptcy Court's decision to temporarily enjoin Appellant's claims against the Sacklers was a well-reasoned exercise of its discretion, grounded in the evidentiary record before the court.  The Bankruptcy Court, following binding Circuit precedent, faithfully applied the four preliminary injunction factors after

24

carefully weighing the evidence that the Debtors had adduced.  The Bankruptcy

Court found that continued pursuit of such litigation could destroy the Debtors'

prospects for a successful reorganization, that the Debtors otherwise have more

than viable prospects for such success, and that any harm Appellant would suffer

from being enjoined is heavily outweighed by the concomitant harm that the

Debtors, the estates, and all their stakeholders would face if Appellant's claims

against the Sacklers were to proceed.  Based on those findings, the Bankruptcy

Court exercised its sound discretion to enjoin Appellant's suit.  Appellant identifies

no error in the Bankruptcy Court's legal conclusions, adduces no evidence that

could show any of the Bankruptcy Court's factual findings are clearly erroneous,

and offers no basis to conclude that the Bankruptcy Court's decision to issue the

Preliminary Injunction was an abuse of its broad discretion.  The Court should thus

affirm, just as the District Court previously affirmed the Preliminary Injunction in

*Dunaway*.

## **ARGUMENT**

## I.   **THIS APPEAL IS MOOT BECAUSE THE BANKRUPTCY COURT ORDER ON APPEAL HAS EXPIRED AND BEEN SUPERSEDED**

This appeal is moot and should be dismissed.  The Bankruptcy Court order

appealed from has expired, and Appellant failed to timely appeal the more recent

order renewing the Preliminary Injunction on Appellant.

This is an appeal from the Thirty-Second Amended PI Order.  That order expired 30 days after the Second Circuit decision, on June 29, 2023.  (JA2779 (Thirty-Second Amended PI Order) at 14.)  The stay imposed by that order has ended, and Appellant cannot be granted any relief from that order.  This appeal is therefore moot and should be dismissed.  *See, e.g.*, *Video Tutorial Servs. v. MCI Telecomms. Corp.*, 79 F.3d 3, 5-6 (2d. Cir 1996) (holding that "[a]n interlocutory appeal from a temporary stay no longer in effect, like an interlocutory appeal from a since-expired or vacated temporary restraining order, is the paradigm of a moot appeal" and explaining that "[w]hen an appeal becomes moot, we must dismiss it, since we have no jurisdiction over moot controversies").

It is true that the Preliminary Injunction continues pursuant to the Thirty-Third Amended PI Order.  But this Court, respectfully, lacks appellate jurisdiction over that order because Appellant failed to file a timely notice of appeal from it. The filing of a timely notice of appeal is a jurisdictional prerequisite for an appeal from a bankruptcy court order.  28 U.S.C. § 158(c)(2); Fed. R. Bankr. P. 8002(a)(1).  If no timely notice of appeal is filed, "the district court is without jurisdiction to consider the appeal."  *Siemon v. Emigrant Sav. Bank (In re Siemon)*, 421 F.3d 167, 169 (2d Cir. 2005) (per curiam); *Sterling v. Carlebach*, 690 F. App'x 747, 747-48 (2d Cir. 2017) (affirming dismissal of an appeal filed seven days after the 14-day deadline).

26

Appellant had until July 26, 2023, 14 days after entry of the Thirty-Third Amended PI Order on July 12, to file a notice of appeal from that order.  Fed. R. Bankr. P. 8002(a)(1).  This is not a procedural "gotcha":  The Debtors warned Appellant in their reply of the need to file a new notice of appeal from the Thirty-Third Amended PI Order, and that this Court would be required to assess "whether [Appellant] properly perfects its appellate rights from any order further extending the Preliminary Injunction" (SPA070-72 (Debtors' Reply) at 2-4), and the Bankruptcy Court noted it does not "have any ability to affect [Appellant's] appellate rights" (SPA171 (June 29, 2023 Hr'g Tr.) 17:2-19.)  Appellant even represented to this Court in its opening brief that it understood that the Thirty-Second Amended PI Order was expiring and that it needed to file a notice of appeal from the Thirty-Third Amended PI Order.  (App. Br. at 11 n.3.)  Yet, despite its representation—and despite the Debtors' admonishments to adhere to the procedure used by the parties in *Dunaway*—Appellant did not file a notice of appeal until August 11, 2023, 16 days after the deadline to do so had passed (SPA039.)  This appeal from the expired Thirty-Second Amended PI Order must be dismissed as moot,[4] and this Court lacks appellate jurisdiction over the operative Thirty-Third Amended PI Order.

_____

[4] Appellant cannot avail itself of the narrow exception to mootness for issues "capable of repetition, yet evading review."  *See Video Tutorial Servs.*, 79 F.3d at 6
(….continued)

## II.   THE BANKRUPTCY COURT HAS SUBJECT MATTER JURISDICTION TO ENJOIN APPELLANT'S LAWSUIT

The Bankruptcy Court correctly determined that it has subject matter

jurisdiction over Appellant's stayed claims.  Both the Second Circuit and District

Court have previously held that Appellant's claims are within bankruptcy

jurisdiction.  *In re Purdue Pharma L.P.*, 69 F.4th at 71-72; (JA4757-63 (D. Ct.

Order) at 85-91.)  That is because bankruptcy jurisdiction exists over "all civil

proceedings . . . related to cases under title 11."  28 U.S.C. § 1334(b).  In this

Circuit, that jurisdiction extends to any claim that "might have any conceivable

effect on the bankrupt estate."  *See, e.g.*, *In re Purdue Pharma L.P.*, 69 F.4th at 71;

*see also SPV Osus*, 882 F.3d at 340; (JA4757 (D. Ct. Order) at 85.)  The words

"any conceivable effect" are just as broad as they appear:  An action "might have"

a "conceivable effect" on a bankruptcy estate "if the outcome could alter the

debtor's rights, liabilities, options, or freedom of action . . . and which in any way

impacts upon the handling and administration of the bankrupt estate."  *SPV Osus*,

882 F.3d at 339-40 (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6

(1995)); *see also Pfizer Inc. v. Law Offs. of Peter G. Angelos (In re Quigley Co.,*

*Inc.)*, 676 F.3d 45, 57 (2d Cir. 2012)).

_____

(explaining exception to mootness).  All Appellant needed to do to ensure review
of the Thirty-Third Amended PI Order was to file a timely notice of appeal.

The only inquiry needed to assess whether Appellant's claims are within the "related to" jurisdiction of the bankruptcy courts is whether it is "conceivable" that Appellant's prosecution of those claims might have an effect on the bankruptcy estate.  The evidence and findings below make clear that it would.

First, as explained in Part III, below, the Bankruptcy Court found that prosecution of Appellant's claims would work irreparable injury to the bankruptcy estates—effects far more severe, and far more certain, than the "conceivable effects" test requires.  (JA2726-34, 37 (Feb. 1, 2023 Hr'g Tr.) 25:21-33:13, 36:2-17.)  Second, and relatedly, the Bankruptcy Court found that Appellant's Complaint is premised on alleged misconduct of the Debtors.  (JA2727-29, 32 (Feb. 1, 2023 Hr'g Tr.) 26:2-28:17, 31:17-21); *see also infra* Part III.  In other words, it would be impossible for Appellant to demonstrate that the Sacklers are liable to Appellant for causing the Debtors' alleged misconduct without first establishing that the Debtors engaged in such misconduct.  (*See id.*)  That alone is all that would be needed to satisfy the "conceivable effect" test under a straightforward application of Second Circuit authority.  *SPV Osus*, 882 F.3d at 342 (holding that "high degree of interconnectedness" supported "related to" jurisdiction); *see also New York City Emps. Ret. Sys. v. Ebbers (In re WorldCom, Inc. Sec. Litig.)*, 293 B.R. 308, 321 (S.D.N.Y. 2003).  Third, the Bankruptcy Court found that Appellant's claims against the Sacklers overlap with the estates' claims

against the Sacklers, meaning that pursuit of Appellant's claims could impact the Debtors' ability to pursue their claims.  (JA2731-34 (Feb. 1 2023 Hr'g Tr.) 30:25-33:13.)  The Second Circuit has already held that this overlap demonstrates the "conceivable effects" necessary for jurisdiction.  *In re Purdue Pharma L.P.*, 69 F.4th at 71-72 ("As a result of [the] substantial overlap [between claims filed against the Debtors and the Sacklers], the litigation of third-party direct claims against the Sacklers would likely impact the Debtor's ability to pursue, and the likelihood of recovering on, the Estate's own claims against the Sacklers.").

Appellant does not appear to dispute that the "conceivable effects" standard set forth in *SPV Osus*, 882 F.3d at 340, is the touchstone for bankruptcy jurisdiction, or that the District Court in *Dunaway* "followed that rule to the letter" in holding that the Bankruptcy Court had jurisdiction to enjoin nearly identical lawsuits against non-debtor third parties (*see* App. Br. at 45-46).  Appellant is thus left to recycle arguments that the Bankruptcy Court, District Court, and Second Circuit have each rejected.  Its initial argument—that "Purdue has failed to come forward with any concrete evidence to substantiate its speculation that the Band's suit will have conceivable effects on the estate" (App. Br. at 45)—is demonstrably false, as shown by the ample findings of the Bankruptcy Court citing to evidence in the record.  (*See, e.g.*, JA2726-30, 2736-37 (Feb. 1, 2023 Hr'g Tr.) 25:10-30:24, 35:19-36:17.)  And its subsequent argument—that the Canadian Competition Act

forbids indemnification—is irrelevant.  The Second Circuit found that the Sacklers

"would have a reasonable basis to seek indemnification from the Debtors" and

could also assert "claims for either insurance coverage or contribution."  *In re*

*Purdue Pharma L.P.*, 69 F.4th at 72 & n.16.  Whether the Sacklers would prevail

on claims for indemnification, insurance, or contribution does not matter:  "[T]he

relevant inquiry is whether the claims for indemnification '*might have* any

conceivable effect on the bankrupt estate.'"  *Id.* (quoting *SPV Osus*).  The mere

fact that the Sacklers might litigate the issue is enough to satisfy the standard of

*SPV Osus*.  *In re Purdue Pharma L.P.*, 69 F.4th at 72 & n.17.  Appellants' attempt

to relitigate issues it has already lost at the Circuit should be rejected.

## III.   THE BANKRUPTCY COURT CORRECTLY DETERMINED THAT ENJOINING APPELLANT'S LAWSUIT IS APPROPRIATE UNDER SECTION 105(A)

Section 105(a) of the Bankruptcy Code authorizes bankruptcy courts to

"issue any order, process, or judgment that is necessary or appropriate to carry out

the provisions" of the Bankruptcy Code, and provides bankruptcy courts with

broad, equitable powers to ensure orderly bankruptcy proceedings.  11 U.S.C.

§ 105(a).  The Second Circuit has held, for decades, that "the Bankruptcy Court

has authority under section 105 broader than the automatic stay provisions of

section 362 and may use its equitable powers to assure the orderly conduct of the

reorganization proceedings."  *Erti v. Paine Webber Jackson & Curtis, Inc. (In re*

*Baldwin-United Corp. Litig.)*, 765 F.2d 343, 348 (2d Cir. 1985); *see also*

*MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988) (holding

that Section 105(a) provides "additional authority" to enjoin lawsuits "that might

impede the reorganization process"); *Lautenberg Found. v. Picard (In re Bernard*

*L. Madoff Inv. Secs., LLC)*, 512 F. App'x 18, 19-20 (2d Cir. 2013) ("Section 105(a)

is to be 'construed liberally to enjoin suits that might impede the reorganization

process'" (quoting *MacArthur Co.*, 837 F.2d at 93)).  Every other circuit that has

considered the issue is in accord.[5]

The Bankruptcy Court's authority to preliminarily enjoin actions that

threaten the reorganization process extends to lawsuits against non-debtor third

---

[5] *Catanzarite v. GCL, LLC (In re Daymark Realty Advisors, Inc.)*, No. 21-12766, 2022 WL 703963 (11th Cir. Mar. 9, 2022) (affirming sanctions for violation of Section 105(a) injunction of suits against non-debtors); *Caesars Ent. Operating Co. v. BOKF, N.A. (In re Caesars Ent. Operating Co., Inc.)*, 808 F.3d 1186, 1188 (7th Cir. 2015) (Section 105(a) permits bankruptcy courts to issue injunction when "likely to enhance the prospects for a successful resolution of the disputes attending its bankruptcy"); *Canter v. Canter (In re Canter)*, 299 F.3d 1150, 1155 (9th Cir. 2002) ("Section 105(a) contemplates injunctive relief in precisely those instances where parties are pursuing actions pending in other courts that threaten the integrity of a bankrupt's estate."); *Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 385 n.5 (6th Cir. 2001); *Carlton v. Firstcorp, Inc.*, 967 F.2d 942, 944 n.4 (4th Cir. 1992); *Coporacion de Servicios Medicos Hospitalarios de Fajardo v. Mora (In re Coporacion de Servicios Medicos Hospitalarios de Fajardo)*, 805 F.2d 440, 449 n.14 (1st Cir. 1986); *Browning v. Navarro*, 743 F.2d 1069, 1084 (5th Cir. 1984); *Penn Terra Ltd. v. Dep't of Env't Res.*, 733 F.2d 267, 273 (3d Cir. 1984); *Missouri. v. U.S. Bankr. Ct. for E. D. of Ark. (In re Missouri)*, 647 F.2d 768, 777 (8th Cir. 1981).

parties as well as suits against a debtor within the police powers exception to the

automatic stay in Section 362(b)(4).  *See, e.g.*, *Penn Terra*, 733 F.2d at 273.

Accordingly, the *Dunaway* court held that Section 105(a) "is properly used to

enjoin creditors' lawsuits against third parties where 'the injunction plays an

important part in the debtor's reorganization plan' or where the action to be

enjoined 'will have an immediate adverse economic consequence for the debtor's

estate.'"  (JA4856 (*Dunaway* Decision) at 31 (quoting *In re Bernard L. Madoff Inv.*

*Sec., LLC*, 512 F. App'x at 20).)

In an argument openly at war with Second Circuit precedent, Appellant

asserts that Section 105(a) does <u>not</u> empower bankruptcy courts to enjoin a third

party's suit against a non-debtor, and that bankruptcy courts must look to some

other provision of the Code for that authority.[6]  (App. Br. at 27-29.)  That argument

should be rejected offhand.  If the controlling precedents cited above left any room

for doubt—and they do not—the legislative history of Section 105 makes crystal

clear that Congress intended Section 105(a) to be used to enjoin suits not subject to

---

[6] Appellant's contention that the automatic stay is imposed as a kind of "quid pro quo" for debtors, and thus cannot be extended to non-debtors (App. Br. at 27) is both contrary to precedent and entirely misses the point:  The automatic stay and the injunctive power of section 105(a) protect <u>creditors</u> by preserving the value of the estate from being distributed inequitably through uncoordinated litigation.  *See, e.g.*, *E. Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423, 430-31 (Bankr. S.D.N.Y. 1990).

the automatic stay whenever necessary to ensure an orderly reorganization:  "The

court has ample other powers to stay actions not covered by the automatic stay.

Section 105, of proposed Title 11, derived from Bankruptcy Act Sec. 2a(15),

grants the power to issue orders necessary or appropriate to carry out the

provisions of Title 11."  S. Rep. 95-989, at 51 (1978).  Section 105(a) thus

expressly confirms bankruptcy courts' equitable power to enjoin proceedings—a

power that predates the Bankruptcy Code.[7]  *See, e.g.*, *Cont'l Ill. Nat'l Bank & Tr.*

*Co. v. Chi., Rock Island & Pac. Ry. Co.*, 294 U.S. 648, 675-76 (1935) (holding that

a bankruptcy court has the power to issue injunctions in aid of its jurisdiction

pursuant to the Bankruptcy Act); *Loewi Realty Corp. v. Chanticleer Assocs., Ltd.*

---

[7] The principles that Section 105(a) cannot be used to <u>create</u> a substantive right not
found in other law, *New England Dairies, Inc. v. Dairy Mart Convenience Stores,*
*Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir. 2003),
or that it cannot be used to contravene the express provisions of the Code, *Law v.*
*Siegel*, 571 U.S. 415, 421 (2014), have no application here, despite Appellant's
attempt to confuse the issue.  The Preliminary Injunction does not create any
substantive rights; it is a straightforward exercise of courts' power to ensure
orderly bankruptcy proceedings and protect their jurisdiction to reorganize debtors'
estates under chapter 11 of the Code.  Those equitable powers are complementary
to, not in contravention of, the automatic stay of Section 362.

Appellant's attempt to draw a negative inference from Section 524(g)'s
authorization of a permanent injunction channeling certain claims in a plan of
reorganization relating to asbestos is even more misguided.  Section 524(g)
authorizes an injunction at the <u>end</u> of a case, in a plan of reorganization.  That
statute has nothing to do with a <u>preliminary</u> injunction, and in any event, the
Second Circuit held, in this case, that "in enacting § 524(g), Congress expressly
intended not to change the pre-existing powers of bankruptcy courts."  *In re*
*Purdue Pharma L.P.*, 69 F.4th at 76.

*(In re Chanticleer Assocs. Ltd.)*, 592 F.2d 70, 73-74 (2d Cir. 1979) (Section 105(a)'s predecessor, Section 2(a)(15), confirms "the court's power to preserve its jurisdiction by enjoining proceedings that would remove property from the bankrupt estate [which] is fundamental to the scheme of the Bankruptcy Act").

The standard for determining whether to enjoin lawsuits under Section 105(a) is equally well-established under the law of this Circuit.  As the District Court held in *Dunaway*, Section 105(a) injunctions are appropriate when (1) there is a reasonable likelihood of successful reorganization; (2) there is imminent irreparable harm to the estate and the bankruptcy process in the absence of an injunction; (3) the balance of harms tips in favor of the moving party; and (4) the public interest weighs in favor of an injunction.[8]  (JA4856-57 (*Dunaway* Decision) at 31-32.)  Based on the extensive (and uncontroverted) evidentiary record before it, the Bankruptcy Court correctly determined that the Debtors had adequately demonstrated that all four factors weighed in favor of enjoining Appellant's lawsuit.  (*See* JA2722-36 (Feb. 1, 2023 Hr'g Tr.) 21:21-35:21.)

---

[8] Appellant's assertion that the Second Circuit's confirmation decision overturned *Dunaway* and decades of other Second Circuit authority *sub silentio* (App. Br. at 33) is both bizarre and baseless.  The Second Circuit had no occasion to review the Preliminary Injunction or *Dunaway* in its recent opinion.  That opinion confirmed that the Code authorizes permanent, nonconsensual releases of a third party's claims against non-debtors, and established the criteria for such a permanent release of claims and injunction.  *In re Purdue Pharma L.P.*, 69 F.4th at 82.

A.      **The Appellees Have Reasonable Prospects for a Successful Reorganization**

The record amply demonstrates that the Debtors have a reasonable likelihood of a successful reorganization.  That requires only a showing that "the prospects of reorganization remain viable" and that "the Debtors are substantially more likely to reorganize with the injunction in place."  (JA4858 (*Dunaway* Decision) at 33); *see also Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 589 (Bankr. S.D.N.Y. 2009); *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 386 B.R. 17, 44 (Bankr. D. Del. 2008); *Nevada Power Co. v. Calpine Corp. (In re Calpine)*, 365 B.R. 401, 409 (S.D.N.Y. 2007).  The Bankruptcy Court correctly found that the Debtors readily met that standard, as evidenced by the prospect of either succeeding in their then-pending appeal to the Second Circuit, or, if the Second Circuit did <u>not</u> affirm the Confirmation Order, based on the parties' successful track record of forging an enhanced settlement after the District Court's December 2021 order vacating the Confirmation Order.  (*See* JA2722-26 (Feb. 1, 2023 Hr'g Tr.) 21:24-25:9.)  These cases are at least "reasonably likely" to succeed, whatever the outcome of the Supreme Court's review of the Second Circuit's decision that affirmed the Confirmation Order.  *In re Purdue Pharma L.P.*, 69 F.4th at 69.

The Preliminary Injunction remains as essential as ever.  These cases can be brought to a long-awaited, and much-needed, resolution only if the conditions for

their success, including the pause of value-destructive litigation, remain in place.

Consequently, the Bankruptcy Court found that lifting the injunction would "revive

the litigation free-for-all that existed before the injunction was issued and . . . lead

to [the] destruction of billions of dollars of value, undoing the prospect of any

comprehensive resolution as each party will look out for its own parochial

interests."  (JA2725 (Feb. 1, 2023 Hr'g Tr.) 24:19-24.)

Appellant points to no evidence calling into question the Bankruptcy Court's

findings that the Debtors' reorganization is likely to succeed or that the

Preliminary Injunction is necessary to preserve the Debtors' prospects of success.

Instead, according to Appellant, the Bankruptcy Court erred by "mistakenly

focusing on the Preliminary Injunction's overall effect on the reorganization

process" as an "improper consequence of its erroneous refusal to consider leaving

the Band's lawsuit outside the Preliminary Injunction while otherwise keeping it in

place."  (App. Br. at 34-35.)  Appellant then proceeds to argue why allowing its

suit—and only its suit—to proceed would not undermine the success of these

cases.  Appellant is wrong.

The Bankruptcy Court's refusal to consider allowing Appellant to be the

only such civil suit to proceed during the pendency of the Preliminary Injunction

was not a "mistake[]," as Appellant tells it.  (*Id.* at 34.)  To the contrary, the

Bankruptcy Court expressly considered and "emphatically reject[ed]" Appellant's

plea for special treatment as "inappropriate."  (JA2726 (Feb. 1, 2023 Hr'g Tr.) 25:4-9.)  And for good reason.

Appellant's claims are, as the Bankruptcy Court found, "virtually indistinguishable" from claims that other creditors brought <u>before</u> the Debtors filed for bankruptcy and <u>before</u> the Preliminary Injunction issued (as detailed in Part III.A.2, *infra*).  (JA2726 (Feb. 1, 2023 Hr'g Tr.) 25:4-9.)  It is true that the Plan does not release, and the Preliminary Injunction does not enjoin, claims against the Sacklers insofar as they relate to Purdue Canada and does not rest on alleged conduct of the Debtors.  (JA2776-77 (Third-Second Amended PI Order) at 1-3; JA4288, 4405-06 (Plan) §§ 1.1 ("Excluded Claim"), 10.7(c).)  But that is beside the point.  As a Canadian entity, Appellant could have brought claims against Purdue Canada and the Sacklers' alleged conduct with respect to Purdue Canada.  <u>But it did not</u>.  Instead, Appellant sued the Sacklers in New York on account of the alleged conduct of the <u>Debtors</u> in the United States and the Sackler's alleged conduct in the United States directing the <u>Debtors</u>, parroting the allegations of the hundreds of other "virtually indistinguishable" suits against the Sacklers that have been subject to the Preliminary Injunction for years.  (JA2726 (Feb. 1, 2023 Hr'g Tr.) 25:4-9.)  Appellant does <u>not</u> want recognition of its difference—as such a difference does not exist—but rather a special indulgence, whereby Appellant can run ahead of every state, every Indian tribe, every domestic municipality, every

38

adult or pediatric personal injury victim, and every school district, hospital, insurer, or other one of the Debtors' more than 600,000 creditors.  And Appellant wants that special favor as an award for its laxity in suing more than <u>three years later</u> than virtually every one of the plaintiffs it hopes to cut in line.  It is no surprise Appellant cites no authority whatsoever—as the Debtors are aware of none—that could support its argument that the Bankruptcy Court's decision to reject such an inequitable and capricious exercise of its injunctive authority is "erroneous" or an abuse of discretion.

### B.    Prosecution of Appellant's Suit Would Irreparably Harm the Estates, Their Creditors, and the Debtors' Prospects for Reorganization

Allowing Appellant to prosecute its action would squander estate resources, imperil the estates' most valuable assets, and risks torpedoing the reorganization— and with it, equitable distribution of billions of dollars committed to opioid abatement and victim compensation.  The Bankruptcy Court correctly concluded that irreparable harm warranting an injunction is demonstrated so long as the actions to be enjoined "would embarrass, burden, delay or otherwise impede the reorganization proceeding, or if a stay is necessary to preserve or protect the debtor's estate and reorganization prospects."  (JA2726 (Feb. 1, 2023 Hr'g Tr.) 25:13-20 (quoting (JA4859 (*Dunaway* Decision) at 34)); *see also In re Lyondell Chem. Co.*, 402 B.R. at 590-91 (same).

Appellant falsely asserts that the Bankruptcy Court "assumed" these irreparably injuries would follow because it "overlooked" differences that mean Appellant's suit would not cause "*any* harm" to the estates.  (App. Br. at 38.)  But the Bankruptcy Court did not assume or overlook anything; to the contrary, the Bankruptcy Court found, on the extensive and largely uncontroverted evidentiary record, that permitting Appellant's suit to proceed would risk imminent and irreparable harm to the Debtors and their estates.  (JA2726-31 (Feb. 1, 2023 Hr'g Tr.) 25:10-30:24; JA4859-60 (*Dunaway* Decision) at 34-35.)

### 1. Appellant's Lawsuit Is Virtually Indistinguishable from Governmental Suits Enjoined Since October 2019

Appellant's lawsuit is a lawsuit against the Debtors in all but name, just like the domestic governmental suits that have been enjoined since 2019.  Although Appellant disingenuously claims that "Purdue's conduct is only of peripheral concern to [its] lawsuit" (App. Br. at 39), Appellant admits that its suit <u>requires</u> it to prove that the Debtors engaged in misconduct at the Sacklers' direction, and that Appellant's alleged injuries "originate[d] from Purdue's marketing of drugs in the US."  (*Id.* at 39-40.)  Nearly <u>every</u> substantive allegation of its Complaint regarding liability asserts that the Sacklers—the nominal defendants in Appellant's lawsuit—are liable because the <u>Debtors</u> engaged in alleged misconduct in the United States which the Sacklers allegedly "oversaw" (*see, e.g.*, JA1755-60 (Compl.) ¶¶ 141-45, 147-49, 152-54), "monitored" (JA1756 (Compl.) ¶ 146), or

"endorsed" (JA1761 (Compl.) ¶ 159)).  At times Appellant appears to forget that it

sued the Sacklers, and not Purdue, by making allegations about Purdue (lifted

nearly verbatim from the proof of claim it filed against the Debtors) without <u>any</u>

corresponding allegation tying Purdue's alleged conduct to the Sacklers.  (*See, e.g.*,

JA1765-73 (Compl.) ¶¶ 164-78 (referring to "defendants" but citing only to alleged

actions of Purdue, without any mention of the Sacklers).)  It is these allegations—

directed at the Sacklers but alleging conduct of the <u>Debtors</u>—that make

Appellant's suit virtually identical to the suits domestic governments filed against

the Sacklers before the Preliminary Injunction issued.  The illustrative sample of

the nearly identical allegations in the Complaint and complaints that Oregon,

Delaware, and Washington D.C. filed in 2019, set forth on the following page,

proves the point:

41

| Lac La Ronge Complaint Allegation (JA1722) | Overlapping Allegations in Complaints Subject to Injunction |
|---|---|
| **JA1752 (Compl.) ¶ 139**: "The **Sackler Family Defendants** knew about, allowed, and **directed Purdue's deception** . . . . They were aware of, allowed and directed the content of the messages conveyed in Purdue's marketing." | **SPA179 (*State of Oregon v. Richard S. Sackler et al.*, No. 19CV44161 (Multnomah Cir. Ct. Oct. 10, 2019) ("Oregon Compl.")) ¶ 17**: "In particular, as members of Purdue's Board, the **Sacklers approved and oversaw a deceptive marketing scheme** . . . ." |
| **JA1759 (Compl.) ¶ 152**: "The **Sackler Family Defendants knew or should have known that** Purdue's sales strategy was **deceptive** . . . ." | **SPA175 (Compl., *Delaware v. Sackler*, No. N19C-09-062 MMJ CCLD (Del. Super. Ct. Sep. 9, 2019) ¶ 254**: "The **Sackler Defendants knew or should have known** that their continuing efforts to employ **deceptive** and unfair marketing . . . would contribute to the opioid epidemic . . . ." |
| **JA1737 (Compl.) ¶ 62**: "As a senior executive of Purdue, **Richard Sackler was actively involved** in the invention, development, **marketing**, promotion, and sale of **Purdue's opioid products**, including OxyContin." | **SPA177 (Unredacted Compl., *District of Columbia v. Purdue Pharma L.P.*, No. 2019 CA 003680 B (D.C. Super. Ct. Civil Div. July 8, 2019) ¶ 55**: "**R. Sackler was involved in helping Purdue** negotiate a label for OxyContin with the FDA that would enable the company to broadly **market its new drug**." |
| **JA1756-57 (Compl.) ¶ 147**: "The **Sackler Family** Defendants also oversaw **Purdue's strategy to pay high prescribers** to promote Purdue opioids." | **SPA180 (Oregon Compl.) ¶ 51**: "The **Sacklers directed Purdue to focus** its sales efforts **on reckless prescribers** . . . ." |

After closely reviewing the overlap between Appellant's Complaint and the

complaints enjoined, including the chart above (JA2727 (Feb. 1, 2023 Hr'g Tr.)

26:20-21), the Bankruptcy Court found that the Complaint "does not present

42

claims that are separate and distinct from other existing claims against the debtors"

and that it "overlaps with complaints filed by other entities whose litigation claims

are enjoined." (JA2727 (Feb. 1, 2023 Hr'g Tr.) 26:3-6, 26:23-24; *see also*

JA2724-29 (Feb. 1, 2023 Hr'g Tr.) 23:6-28:13 (citing paragraphs 62, 139, 141-145,

146, 147-149, 152, 154, and 164-178 of Appellant's complaint (JA1737, 1754-60,

1765-1773) as examples of allegations about the Debtors or overlap with existing

complaints).

### 2. Prosecution of Appellant's Lawsuit Will Burden the Estates with Monetary and Non-Monetary Costs

Because the claims in Appellant's lawsuit are virtually identical to the

claims litigated before the Preliminary Injunction issued in 2019, the Bankruptcy

Court weighed the extensive evidence the Debtors submitted in support of the

Preliminary Injunction—informed by the witnesses' firsthand experience before

the Preliminary Injunction was entered—that vividly demonstrates the burdens that

such litigation would impose on the estates. The Debtors' documents will be at the

heart of discovery. (*See* JA1058 (Coleman Decl.) ¶ 37).) The Debtors' current and

former employees will be subject to depositions. (*See* JA1056-57 (Coleman Decl.)

¶¶ 31-35.) The Debtors will need to respond to written discovery. And the

Debtors—as fiduciaries bound to preserve and maximize the value of the estates—

will need to defend against legal rulings that could expose them to additional

liability. The uncontroverted factual record demonstrates that even a single

corporate representative deposition of a former chief financial officer of Purdue "lasted approximately a full day and required approximately 30 hours of [the CFO's] time to prepare."  (JA687-88 (DelConte Decl.) ¶¶ 10, 12 (detailing discovery burdens on the Debtors).)  The Debtors can ill afford such a distraction now, when the Debtors have fewer employees carrying greater responsibilities. (JA4597 (Declaration of T. Ronan) ¶ 8 (explaining that "[c]ontinuing attrition has left the remaining employees to shoulder heightened workloads").)  Appellant's insinuation that it will somehow prove its case about the Debtors' conduct without document or deposition discovery (App. Br. at 40-41) is entirely unrealistic and fails to provide any reason to disturb the Bankruptcy Court's well-supported evidentiary findings.

The monetary costs of litigation are just as real.  The evidence proves that in the lead-up to filing the Debtors' bankruptcy petition, the Debtors were spending over $2 million per week in connection with pending opioid actions against the Debtors and their Related Parties.  (JA699 (O'Connell Decl.) ¶ 17.)  If Appellant were to have its way, that money, which should go to much-needed opioid abatement efforts, would instead go to litigation defense.

3.     **Prosecution of Appellant's Complaint Threatens to Irreparably Injure the Value of the Estates' Most Valuable Assets**

Appellant's claims also inextricably overlap with the estates' claims against the Sacklers.  Those claims, which include claims to recover fraudulent transfers and for veil piercing, alter ego, breaches of fiduciary duty, and failure to supervise, (JA4569 (MBR) at 139), are the most valuable assets of the estate, and are to be resolved as part of a global settlement that will provide the estates with as much as $6 billion dedicated to opioid abatement and victim compensation.  (SPA007-08 (Debtors' Mot. For Order Approving Settlement Term Sheet) ¶¶ 2-3; JA4590 (Order Pursuant to 11 U.S.C. §§ 105 and 363(b) Authorizing and Approving Settlement Term Sheet).)  Because Appellant's claims are premised on the Sacklers' alleged conduct directing or controlling the Debtors, Appellant's claims, like the virtually identical claims the Bankruptcy Court reviewed at the confirmation trial, are "based on essentially the same facts" as the estates' claims. (JA4569-70 (MBR) at 139-40.)  As a consequence, the Bankruptcy Court found, the Sacklers would likely "raise the same defenses" to such claims "as they would to the estates' closely similar claims."  (*Id.*)

The inextricable overlap between the claims of the estates and of Appellant means that allowing Appellant to litigate now would make Appellant's case a test case for estate claims.  The Debtors and hundreds of thousands of creditors would

have to bear the consequences of Appellant's litigation strategy and tactics, because a legal or factual ruling against Appellant (in favor of the Sacklers) on almost any issue could diminish or destroy the value of estate claims. The Bankruptcy Court therefore correctly found that allowing Appellant to gamble with billions of dollars of estate claims would irreparably harm the Debtors and their bankruptcy cases. (JA2732 (Feb. 1, 2023 Hrg Tr.) 31:21-24.)

For the same reasons, allowing Appellant to litigate its overlapping claims threatens to topple the settlements embodied in the Plan. Any change in circumstances regarding the strength or weaknesses of estate or creditor claims against the Sacklers could upset the delicate balance among the estates, creditors, and the Sacklers that has fostered those multibillion-dollar settlements, as the Bankruptcy Court correctly found. (JA2732 (Feb 1. 2023 Hrg. Tr.) 31:4-9.) Appellant dismisses this risk as "speculative" on yet another falsehood: that the settlements contemplated under the Plan have already been consummated and are binding on all parties. (App. Br. at 41.) Not so. The settlements embodied in the Plan have not yet become effective. And the evidence conclusively demonstrates that the Sacklers <u>and creditors</u> would not agree to the settlements embodied in the Plan if they did not bind <u>all</u> creditors with claims against the estates; otherwise, a single creditor could obtain a disproportionate, side recovery to the detriment of all

other creditors.  (SPA157, 166 (Aug. 23, 2021 Hr'g Tr.) 58:8-25, 120:9-19;

JA4503, 65 (MBR) at 73, 135.)

Appellant attempts to rebut all these factual findings—which were rooted in

extensive evidence and common sense—by baldly misrepresenting its Complaint

to this Court.  Appellant first argues that "the Band's claims have nothing to do

with fraudulent transfers."  (App. Br. at 42.)  It should have reread its Complaint

before so asserting:  Paragraph 121 of its Complaint alleges that the Sacklers

"stripped out of Purdue and the Purdue-related Entities each and every year

hundreds of millions of dollars of profits from the sales of OxyContin and other

opioid-containing medications," and that "[a]ll such transfers were and are

<u>fraudulent within the meaning of applicable fraudulent transfer statutes and case</u>

<u>law</u>."  (JA1749-50 (Compl.) ¶ 121 (emphasis added).)  It also asserts that its claims

have "virtually nothing to do with the Sackler's actions controlling, directing, or

managing Purdue US."  (App. Br. at 42.)  This too is false:  The Court need only to

look to the chart above, or the numerous other paragraphs of the Complaint cited

above and by the Bankruptcy Court, to see that Appellant's Complaint is premised

on the Sacklers' alleged control and direction of the Debtors.

Appellant also tries to minimize the risks of its claims by arguing (without

citing any evidence) that "a suit by one set of Canadians" would not "materially"

impair the Sacklers' ability to satisfy their obligations.  (App. Br. at 37.)  But

Appellant's *ipse dixit* is no reason to ignore the arithmetic reality that even a single judgment against the Sacklers risks materially reducing the assets available for the Debtors, particularly given that complaints routinely assert that the Sacklers are liable for billions of dollars in damages to a single plaintiff.[9]

### 4. Prosecution of Plaintiff's Complaint Threatens Equitable Distribution of the Estates and to Restart the Value-Destructive Litigation Landscape

Because Appellant's claims are virtually identical to the claims filed by thousands of the Debtors' other creditors, granting Appellant special permission to proceed ahead of all those creditors would be fundamentally unfair and would also irreparably harm the Debtors and their creditors by restarting the litigation chaos that prevailed prepetition.  (JA2733-34 (Feb. 1, 2023 Hrg. Tr.) 32:17-33:13.)  If allowed to proceed, Appellant's claims would serve as a test case for the claims of many thousands of state, tribal, municipal, individual, and institutional creditors. (JA2734 (Feb. 1, 2023 Hrg. Tr.) 33:1-5.)  Like the estates, those creditors would bear the risks of Appellant's litigation choices, while Appellant—and Appellant alone—would benefit from any judgment in its suit, free from any requirement to share proceeds equitably.  (JA2733 (Feb. 1, 2023 Hrg. Tr.) 32:20-24.)

---

[9] *See, e.g.*, JA682 (Compl., *Commonwealth of Massachusetts v. Purdue Pharma L.P.*) ¶ 898 (alleging "ascertainable injuries and losses of billions of dollars").

Creditors "would never permit" a claimant "similarly situated to them[] to win a litigation race," as the Bankruptcy Court found at the conclusion of confirmation trial. (*See* JA4573 (MBR) at 143). With no other choice, creditors would break from the global resolution and rejoin the litigation race to protect their interests and avoid being leapfrogged by Appellant. (*Id.*) The result would be the collapse of the Plan and destruction of value for all creditors, as the Bankruptcy Court expressly found: "the plan would fail, the Debtors would likely liquidate" and the parties allowed to proceed would "collect materially less money from the Debtors and the [Sacklers]. . . ." (JA4584 (MBR) at 154; JA2734 (Feb. 1, 2023 Hrg. Tr.) at 33:6 (citing JA4573 (MBR) at 143); *see also* JA4860 (*Dunaway* Decision) at 35 (allowing one suit to proceed would "engulf the Debtors' and the Bankruptcy Court in appeals challenging the injunction's application to similar claims . . . in other fora.").)

### C.   The Balance of Equities and Public Interest Both Weigh Heavily in Favor of Enjoining Appellant's Complaint

The Bankruptcy Court also correctly determined that the equities and public interest favoring preservation of the estates and the many interlocking settlements vastly outweigh whatever interest Appellant may have in belatedly pursuing its claims. (JA2734-36 (Feb. 1, 2023 Hrg. Tr.) 33:14-35:18.) On the one side of this balance are the interests of all of the states and territories of the United States, hundreds of Native American tribes, thousands of municipalities, over 120,000

adult and minor personal injury claimants, numerous hospitals, insurers, insurance ratepayers, and schools, all of which have to date abided by the terms of the Preliminary Injunction so that the Debtors and all parties-in-interest can pursue a value-maximizing resolution to these chapter 11 cases in an orderly fashion. (JA2734-35 (Feb. 1, 2023 Hrg. Tr.) 33:19-34:10).  Appellant wishes to subject all of these creditors to the risk that the billions of dollars to be dedicated to opioid abatement and victim compensation will instead be squandered in internecine litigation by creditors against the Debtors' estates, against the Sacklers, and against one another.  The Bankruptcy Court found, on the evidence before it, that the result of such a destructive outcome would be that all creditors (except the federal government) would receive little to nothing from the Debtors' estates.  (JA4520 (MBR) at 90; *see* JA2732 (Feb. 1, 2023 Hr'g Tr. 31:4-9 ("[A]llowing the movant to prosecute its claims would threaten to topple the current settlement that provides for the estates to receive as much as $6 [b]illion dedicated to opioid abatement and victim compensation").)  And this does not begin to account for the opportunity costs of more than three years of collective efforts to achieve the interlocking settlements at the foundation of the Plan.

On the other side of this balancing test is Appellant's sole interest in pursuing its litigation now.  Appellant's justification for privileging its interests over all others is to argue—without any evidence in support—that its claims

would, by themselves, work no harm as long as the Bankruptcy Court allowed only

Appellant's case to proceed.  Debtors have already explained the myriad reasons

why that outcome would have been lawless, unfair, and ultimately futile.  Although

Appellant laments (falsely) that it is not entitled to "any prospect of recovery under

the Plan"[10] and must pursue its suit "to give [it] some measure of equal footing

with other creditors" that, too, is pure misdirection.  (App. Br. at 43-44.)  As the

Second Circuit correctly observed, the Plan already contemplates "another source

of recovery" for Canadian claimants like Appellant through Purdue Canada.  *See In

re Purdue Pharma L.P.*, 69 F.4th at 85.  Appellant's interest in pursuing its belated

Complaint is thus greatly overwhelmed by the interests of preserving estate value

for the benefit of <u>all</u> of the estates' stakeholders.

## IV.   APPELLANT'S BELATEDLY RAISED CLAIM OF SOVEREIGN IMMUNITY PRESENTS NO OBSTACLE TO THE PRELIMINARY INJUNCTION

Appellant's professed sovereign immunity is no obstacle to the Preliminary

Injunction, both because Appellant waived this argument by failing to raise it

below and because the Bankruptcy Code expressly abrogates any sovereign

---

[10] Appellant's claims in Class 11(c), to the extent valid, will receive a pro rata share of $15 million reserved for valid claims in that class.  (JA4304, 31 (Plan) §§1.1 "Other General Unsecured Claim Cash," 4.13(a).)  Such treatment is authorized by and entirely consistent with the Bankruptcy Code.  *In re Purdue Pharma L.P.*, 69 F.4th at 84.

immunity to which Appellant might have been entitled.  Appellant now argues that

it "plainly put the Bankruptcy Court on notice" that it was asserting tribal

sovereign immunity.  (App. Br. at 50 n.7)  But the record disproves this:  The

phrases "sovereign immunity" or "tribal immunity" do not appear <u>anywhere</u> in

Appellant's objection to entry of the Preliminary Injunction.  (JA1692-1720 (Opp.

Br.).)  It is no wonder that the Bankruptcy Court concluded that "[t]he Court does

not believe the movant[] here ha[s] made such an argument [of sovereign

immunity]."  (*See* JA2739 (Feb. 1, 2023 Tr.) 38:13-14.)  Having failed to present

its argument to the Bankruptcy Court, Appellant has waived that argument on

appeal.  *See, e.g.*, *Androse Assocs. of Allaire, LLC v. Great Atl. & Pac. Tea Co.,*

*Inc. (In re Great Atl. & Pac. Tea Co., Inc.)*, 472 B.R. 666, 678-79 (S.D.N.Y. 2012)

(appellant waived its arguments by not raising them below).

Even if Appellant had properly raised and preserved this argument, and even

if Appellant had borne its burden of demonstrating that it is entitled to any such

immunity, Section 106(a) of the Bankruptcy Code unmistakably abrogates any

sovereign immunity with respect to Section 105 of the Code.  It provides that

"[n]otwithstanding an assertion of sovereign immunity, sovereign immunity is

abrogated as to a governmental unit to the extent set forth in this section with

respect to the following:  (1) Section[] 105 . . . ."  11 U.S.C. § 106(a)(1).  The

Preliminary Injunction was issued pursuant to Section 105(a) and thus squarely

falls within Section 106(a)'s abrogation of sovereign immunity.  In response, Appellant retreats into a nonsensical word salad, arguing that 106(a)'s "reference to Section 105 . . . cannot be read to abrogate sovereign immunity in a manner that would allow the Bankruptcy Court to issue the Lac La Ronge Injunction."  Not only "can" Section 106(a) be read to abrogate sovereign immunity for the injunctive powers of Section 105(a), it must be read that way, because courts "must give effect . . . to every clause and word" of a statute.  *Sester v. United States*, 566 U.S. 231, 239 (2012) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)).  If there were any question about the scope of abrogation in Section 106, the Supreme Court eliminated it a few weeks ago, when it held that "the Code unequivocally abrogates the sovereign immunity of all governments, categorically."  *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 143 S.Ct. 1689, 1698 (2023).

Moreover, the Second Circuit has already decided that Appellant waived any sovereign immunity it may have had by its voluntarily and fulsome participation in these cases.  *In re Purdue Pharma L.P.*, 69 F.4th at 84 ("The Canadian Creditors also cannot be described as unwilling with regard to this judicial process, in which they have fully and voluntarily participated.").  Although it now professes that it "did not submit itself to the court's authority to enjoin its claims against non-debtor" (App. Br. at 53), that self-serving assertion can neither undo the

consequences of years of voluntary participation or excuse an à la carte approach whereby Appellant could secure all the benefits of participation while claiming immunity from any order that it does not like.

## CONCLUSION

For all of the foregoing reasons, the Debtors respectfully request that the Court dismiss this appeal as moot, or, alternatively, affirm the Preliminary Injunction under the Thirty-Third Amended PI Order.

Dated:  August 15, 2023
New York, New York

By: */s/ Benjamin S. Kaminetzky*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Eric M. Kim

*Counsel to the Debtors-Appellees
and Debtors in Possession*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8015(h), the undersigned certifies that the above memorandum complies with the applicable type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B) because, excluding the parts of the memorandum exempted by Federal Rule of Bankruptcy Procedure 8015(g), this memorandum contains 12,992 words. The above memorandum also complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6), as required by the February 3, 2020 Individual Practices and Procedures—Vincent L. Briccetti § 7, because this memorandum has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

*/s/ Benjamin S. Kaminetzky*
Benjamin S. Kaminetzky

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2023, I caused true and correct copies of the above memorandum to be served by the Court's Case Management/Electronic Case File (CM/ECF) System to all parties to the above-captioned appeal.

<u>/s/ Benjamin S. Kaminetzky</u>
Benjamin S. Kaminetzky